(No. 44402.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. FRANK ALEX HENENBERG, Appellant.

*Opinion filed September 25, 1973.*

6

KENNETH L. GILLIS, District Defender, Illinois Defender Project, of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield (JAMES B. ZAGEL and RONALD HANNA, Assistant Attorneys General, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

A jury in the circuit court of McHenry County found the defendant, Frank Alex Henenberg, guilty of the armed robbery and murder of Martin Zlogar and recommended that he be sentenced to death. The death penalty was imposed, and the defendant has appealed.

On the morning of December 13, 1969, a badly decomposed body with a plaster cast on the left arm and with the right forearm missing was found by hunters in the northern part of McHenry County. An autopsy determined that the cause of death was a bullet wound in the head and that the deceased had been dead for about three months. A .32-caliber bullet was recovered from the deceased's skull. From the clothing found, and by comparison of X rays of the teeth and left arm, the body was identified as that of Martin Zlogar, an aviation radio technician employed by North Central Airlines, who had had a cast on his fractured left arm when he had been reported missing on September 18, 1969.

The defendant was arrested in St. Louis, Missouri, on December 30, 1969, upon unrelated charges. At the time of his arrest he was driving Martin Zlogar's automobile, which he told the arresting officers he had stolen in the St. Louis area in September. Five days later two officers from the McHenry County sheriff's office questioned the defendant in St. Louis about Zlogar's death. At the trial both officers testified that during this interrogation the defendant confessed to shooting Zlogar, who had picked him up as a hitchhiker. One of them, as well as the McHenry County sheriff, also testified that the defendant confessed a second time while being transported to McHenry County after he had waived extradition to Illinois.

In addition, prosecution witnesses testified that the defendant had stolen a .32-caliber revolver from his

cousin's tavern in St. Louis on September 2, 1969; that he had visited a friend in River Falls, Wisconsin, in September, and left there on September 14, 1969, with a gun in his possession. A Wisconsin State trooper issued him a warning ticket on September 14, 1969, for walking on Interstate 94, a main highway between Minneapolis, where the deceased had been on business, and Chicago. The defendant's automobile was found abandoned outside of River Falls, Wisconsin, in early October, 1969. An FBI handwriting expert testified that some invoices for purchases at gas stations made with Martin Zlogar's credit card between September 13, 1969, and October 25, 1969, in Rockford and Normal, Illinois, as well as St. Louis, Missouri, were signed by the defendant, and that others contained significant similarities to the defendant's handwriting. The defendant was driving Martin Zlogar's automobile, and had Zlogar's gasoline credit card, credit card case, and wallet in his possession when he was arrested in St. Louis.

The defendant testified in his own behalf. He admitted that he had stolen the car and used the credit card on occasion, but denied that he shot Zlogar.

The defendant's primary contention on appeal is that the trial court erred in denying his pretrial motion to suppress the confessions that he made to the McHenry County officers. At the hearing on that motion the State's Attorney and defense counsel agreed that the admissibility of the first confession controls the admissibility of the second. The defendant contends that his first confession was obtained through interrogation that was continued after he had requested counsel and for that reason should have been suppressed under the holding in *Miranda v. Arizona (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602*. Alternatively, he argues that the confession was coerced.

The interrogation which resulted in the defendant's first confession took place from approximately 2 P.M. to 3

P.M. on January 4, 1970, in a room in the headquarters of the St. Louis Police Department. The room was approximately 4 feet by 8 feet and contained a small table and four chairs. A large window was on one wall and a "two-way mirror" on another wall. The questioning was conducted by Lieutenant Madsen and Detective Hendle of the McHenry County sheriff's office. Milford Rohr of the St. Louis Police Department was present during the initial stages of the interrogation, and observed much of the remainder through the two-way mirror.

The entire interrogation was tape-recorded and transcribed. The tape recording was tendered to the trial judge at the hearing on the motion to suppress, but the judge was of the opinion that it would serve no useful purpose. The transcript of the confession was not offered in evidence. The substance of the confession was put before the jury through the testimony of the two McHenry County officers as to what was said by the defendant.

It was uncontradicted that the first thing Lieutenant Madsen did when the defendant was brought into the room was introduce himself and Detective Hendle as police officers and read him his constitutional rights from a *Miranda* warning card. The defendant responded that he understood those rights. It was brought out upon cross-examination that the defendant asserted his desire to see a lawyer four different times during the interrogation, before he confessed that he had shot Zlogar. He first said, "I would rather see a lawyer, you know, you know what I mean, because I believe you can see my standpoint," to which Lieutenant Madsen replied, "Yes, we can see your standpoint. Like I say, we can take you apart." Later the defendant again said, "I ain't talking about nothing else unless—without a lawyer, you know what I mean, because—." Later on in the interrogation the defendant said, "I would rather see a lawyer, you know." And finally he stated, "I believe it would be better on my part to see a lawyer because—." On none of these occasions did the

officers cease their interrogation of the defendant, and each time he answered questions subsequently put to him.

We may dispose at once of the defendant's contention that his confessions were coerced. That contention is not sustained by the record. The statement of the officer to the effect that "we can take you apart" did not refer to physical violence but rather to the fact that law-enforcement agencies had uncovered accurate information as to the defendant's conduct and movements before and after the crime was committed.

The contention that the confessions should have been suppressed under *Miranda v. Arizona (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602*, however, stands upon a different footing. In that case the Supreme Court held that when an individual is taken into custody or otherwise deprived of his freedom by the authorities he must be warned of his constitutional rights prior to any questioning. The court also held:

> "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.* Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (Emphasis added.) 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612.

Numerous cases have held that a confession or statement obtained from a defendant by interrogation

which continued after the defendant had requested an attorney was a violation of *Miranda.* In discussing a situation similar to the present one, the United States Court of Appeals for the Fifth Circuit recently stated:

"Defendant was arrested at a United States Post Office and taken to a workshop area in the post office where he was advised of his rights by the arresting Postal Inspector. In the words of the interrogating officer, 'He told me that he wanted representation by an attorney; that he wanted an attorney.' Nevertheless, for reasons never really explained, against the explicit directions of the defendant and in complete disregard of the express language of the Supreme Court's *Miranda* decision, the interrogating officer persisted in questioning Defendant for more than an hour, eliciting incriminating information which was later introduced at trial over Defendant's objection.

The language of the Supreme Court in *Miranda* could hardly have been more uncompromising. 'If [the accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking *there can be no questioning.' Miranda, supra,* 384 U.S. at 445, 86 S. Ct. at 1612 (emphasis added). 'The right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege.' 384 U.S. at 469, 86 S. Ct. at 1625. 'Any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. \*\*\* If the individual states he wants an attorney, *the interrogation must cease until an attorney is present.'* 384 U.S. at 474, 86 S. Ct. at 1628 (emphasis added)." *United States v. Blair (5th Cir. 1972), 470 F.2d 331, 337-38.*

See also, *United States ex rel. Williams v. Twomey (7th Cir. 1972), 467 F.2d 1248; People v. Randall (1970), 1 Cal. 3d 948, 464 P.2d 114, 83 Cal. Rptr. 658; People v. Ireland (1969), 70 Cal. 2d 522, 450 P.2d 580, 75 Cal. Rptr. 188; Brown v. State (Ind. 1971), 270 N.E.2d 751; State v. Smith (Minn. 1972), 203 N.W.2d 348; State v. Word (1969), 80 N.M. 377, 456 P.2d 210; Commonwealth v. Leaming (1968), 432 Pa. 326, 247 A.2d 590; Commonwealth v. Nathan (1971), 445 Pa. 470, 285 A.2d 175; Arnold v. State (Fla. Ct. App. 1972), 265 So. 2d 64, cert. denied (1973), 272 So. 2d 817.*

In the present case the record shows that the defendant repeatedly told the officers that he wanted to consult with a lawyer. Nevertheless, interrogation continued until a confession was obtained. It follows that the motion to suppress should have been allowed. We have carefully reviewed the evidence, and without deciding whether the admission into evidence of a confession obtained in violation of *Miranda* can ever be harmless error, we have concluded that the admission of testimony concerning the defendant's confessions was not harmless beyond a reasonable doubt. (See, *Chapman v. California (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.*) The judgment must therefore be reversed, and the defendant granted a new trial at which those portions of his confessions which followed his first request for counsel are suppressed.

Of the remaining matters raised by the defendant upon appeal, only two are likely to recur. The first concerns the admissibility of certain physical evidence taken by the police from Zlogar's automobile which the defendant was driving when he was arrested by the St. Louis officers who were looking for him in connection with unrelated charges. At that time the defendant told the officers that he had stolen the car, which was searched in the police garage after he had been taken into the police station. Among the items found during that search and

received in evidence was a shirt belonging to Zlogar and an address book which belonged to the defendant. The trial judge ruled that the defendant had no standing to assert the illegality of the seizure of these items, and we think his ruling was correct.

There can be no doubt that the defendant lacked standing to object to the search of the car so far as things that belonged to Zlogar are concerned. And we are satisfied also that the defendant lacked standing to object to the seizure of the address book and any other things that belonged to him and were found in the car, whether on the floor or the seat, or in the trunk or the glove compartment. To hold otherwise would mean that the automobile that the defendant had stolen was somehow transformed into a place of sanctuary, into which he could put his own belongings, free from the eyes of the law. We find it impossible to accept this proposition. Cases which describe the kind of interest that will afford standing to challenge the legality of a search in terms of a "proprietary or possessory interest in the premises searched or the goods seized" do not involve property illegally placed upon premises belonging to another.

The second matter that may arise upon the new trial concerns photographs of the decomposed body and oral testimony as to its condition, as well as a graphic demonstration with a color slide and model skull. The defendant contends that these were "cumulative and highly prejudicial and obviously intended to arouse the emotions of the jury against the defendant." There are three photographs to which the defendant objects. One depicts the deceased's skull and left arm, which was in a plaster cast, while the other two, one of which is in color, depict different views of his skull. We have held that "where photographs are relevant to establish any fact in issue *** they are admissible in spite of the fact that they may be of a gruesome nature." (*People v. Speck (1968), 41 Ill.2d 177, 202;* see also *People v. Jenko (1952), 410*

*Ill. 478, 482.*) In this case the photograph of the skull and left arm showed the condition of the body as it was found and corroborated testimony concerning the cause of death and the identity of the victim. The other two photographs, which showed a bullet hole in the skull, tended to show the cause of death. It was not error to admit all three photographs into evidence. (*People v. Newbury (1972), 53 Ill.2d 228, 242.*) They did not become unnecessarily cumulative because there was oral testimony concerning the same issues.

The oral testimony of which the defendant complains was that of the sheriff, a veterinarian who X-rayed the left arm of the body on the day after it was found, and a pathologist who performed the autopsy on the body. Each one, in the course of his testimony, stated that the body was infested with maggots. Each one's statement was relevant and their testimony was not cumulative. The sheriff's testimony was necessary to explain why the body was taken to the sheriff's garage for the autopsy and why a veterinarian was called to X-ray the arm of the body. The pathologist's testimony was necessary because it was in part upon the basis of the amount of putrefaction of the tissue and the state of development of the maggots on the body that he determined when death had occurred. And the veterinarian's testimony was necessary to explain why he used a specific procedure in X-raying the arm. We find no error in the admission of this testimony.

The demonstration of which the defendant complains involved the use of a model of a human skull, together with a colored slide of the deceased's skull, to show the cause of death. The demonstration was a useful adjunct to the testimony of the pathologist as to the cause of death, because it enabled him to explain more clearly what was shown in the photographs.

The judgment of the circuit court of McHenry County is reversed and the cause remanded for a new trial.

*Reversed and remanded..*