THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JEANNETTE M. MINNIS, Defendant-Appellant.

Fourth District   No. 4—82—0569

Opinion filed September 30, 1983.

346

TRAPP, J., concurring in part and dissenting in part.

Daniel D. Yuhas and James G. Woodward, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

Defendant was convicted of the offense of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)) by a jury in the circuit court of Champaign County. The State did not seek the death penalty and the trial court declined to impose an extended sentence which was argued by the State. After considering factors in aggravation and mitigation, presentence reports and the arguments of counsel, the court sentenced the defendant to 25 years' imprisonment.

On appeal defendant has raised a variety of issues: (1) error by the trial court in excluding evidence of what has been called in the record the "battered woman syndrome"; (2) reasonable doubt; (3) mis-

behavior by a spectator; (4) improper closing argument by the prosecutor; (5) admission of inflammatory photographs; and (6) errors in the instructions. We regard the question of the battered woman syndrome as reversible error; the instructional issues contain error but not reversible error; and the other issues are without merit.

Since the question of reasonable doubt has been raised, a recitation of the facts as developed at trial is necessary. One pivotal fact which casts its influence over the entire record is that the body of the victim, Movina Minnis, defendant's husband, was dismembered by the defendant, parts of it placed in plastic refuse bags and the bags deposited in garbage dumpsters in various locations around the city of Decatur. Some parts, namely the head and neck, upper torso, and the hands were never recovered. Defendant testified that she threw these into the Sangamon River at Decatur. The parties lived in Rantoul where, defendant testified, the death occurred.

The fact of dismemberment arose very early at the pretrial stage. Defendant filed a motion *in limine* to exclude the evidence. The State demanded its admission in order to establish consciousness of guilt on the part of the defendant. The trial court denied the motion.

The State filed a motion *in limine* to exclude evidence of the "battered woman syndrome." It appeared that the defendant was ready to admit dismembering her husband, but claimed that she was a victim of this syndrome. The trial court indicated that evidence of the syndrome should be admissible in cases where the battered woman killed her husband in a nonconfrontational situation, the classic example being where a battered woman has killed her husband as he slept. The judge stated that he assumed the evidence would follow that pattern and denied the State's motion, but cautioned that he might change his ruling. That is, in fact, what occurred.

At trial the People built a largely circumstantial case, coupled with certain admissions by the defendant, as their case in chief. Certain Decatur residents stated that they observed a black woman fitting defendant's description place two garbage bags in the dumpster at their apartment house at about 1:15 p.m. on October 13, 1981. Their curiosity was aroused and when the garbage collector arrived a short time later, they asked him to open the bags. He did so and retrieved therefrom a black human leg. The Decatur police were immediately notified and instituted a systematic search of other dumpsters in the Decatur area. Six additional bags were discovered at four locations; these contained other body parts and one bag contained miscellaneous items: a dovetail saw, a hack saw, shower curtains and bathroom rugs, several pairs of plastic gloves, one right-hand vinyl glove,

a woman's caftan robe, and a pair of men's swimming trunks. These items were identified as belonging to defendant and her husband. The lower torso was clothed in jockey shorts and the genitalia were present and unmutilated.

Other witnesses placed a brown van which matched the description of one owned by defendant and her husband and driven by a black woman in various locations about Decatur between 11 a.m. and 2:30 p.m. on October 13.

A pathologist assembled the body parts which had been found and performed an autopsy on October 14 at 6 a.m. From prior medical records obtained from Burnham City Hospital in Champaign it was later determined that the partial, dismembered body was that of Movina Minnis. The doctor was unable to determine the cause of death because anything involving the missing body parts, *i.e.*, head, neck, upper torso, could have been the cause. He doubted that the dismemberment itself was the cause but could not rule it out completely.

It was likewise difficult to determine the time of death. Because there appeared to be no decomposition of the parts, he estimated that death had occurred within a 24- to 36-hour period prior to the autopsy and that dismemberment had occurred shortly afterwards.

A co-worker of Movina, Michael Simlin, testified that they both worked at Kraft Company in Champaign on the 3:30 p.m. to 11:30 p.m. shift, Monday through Friday. They also had a car pool arrangement, each driving alternate weeks. Simlin drove the week of Monday, October 5, through Friday, October 9. They were returning home on Friday, October 9, when Simlin's car broke down about six blocks from Movina's home. Movina walked home and returned in his van to give Simlin a ride home. The following morning, Saturday, October 10, Movina picked Simlin up and helped him to repair his car. He left about noon and asked Simlin to come to his house to watch television since he had no plans for the weekend. Simlin never saw Movina again.

The next week, October 12-16, it was Movina's turn to drive. On Monday morning, October 12, at about 8 or 9 a.m., defendant appeared at Simlin's house and stated that Movina would not be able to drive since he was ill with tonsillitis. According to Simlin, defendant appeared normal at that time. She appeared again at Simlin's house on Wednesday morning, October 14, and reported that Movina's condition was worsening; again, according to Simlin, she appeared normal. Later in the day she informed Simlin that Movina had been offered a job at the power plant in Clinton, and on Thursday, October 15, she informed Simlin that he had accepted the job at Clinton and

would not be returning to work at Kraft in Champaign. She admitted to Simlin, upon his inquiry, that Movina had not given any notice to his supervisor at Kraft.

Certain employees of Kraft testified for the State. Movina's supervisor stated that he had an outstanding attendance record and would always notify him if he were unable to come to work. He further stated that defendant called him and advised that Movina was ill with tonsillitis and would not be at work. This occurred on Monday, October 12. He asked to speak to Movina personally because of such a company policy regarding excuses, and asked that Movina call him later. That call was never made. Defendant called the supervisor again on Tuesday and Wednesday with the same information that Movina was too ill to come to the phone and talk; she also stated that he would probably not return to work until the following week. Movina never returned to work.

Kraft's personnel clerk testified that defendant appeared at the company's office on October 23 to turn in Movina's uniforms and to pick up his payroll check for a one-week pay period which was still due to him. She refused to turn over the check until Movina had talked with his supervisor. Consequently, the check was not delivered to defendant. She also testified that Kraft was still holding a check for about $2,000 representing Movina's contributions to an employee thrift plan. According to the clerk, defendant's demeanor was cool and collected; she had known defendant as a former employee of Kraft.

A significant witness for the State was Diana Hinton. She testified that she was acquainted with both defendant and Movina, having met them at a homosexual bar in Champaign about two years prior to October 1981. Shortly after this first meeting, she had spent two weekends with the Minnises at their home during which the three of them had engaged in trilateral sexual conduct. Hinton stated that she felt Movina was not partial to this form of sexual encounter but that defendant was the moving party; she was also aware that defendant had been beaten by Movina and that their marital problems were the result of "Mo's sexual preferences."

Hinton saw defendant and Movina at the same bar on October 7, 1981, at approximately 1 a.m. She never saw Movina after that occasion, but she did see defendant there on October 11 from about 11 p.m. to 1 a.m. Upon inquiry by Hinton, defendant stated that Movina had left her and gone to California with another woman. She stated that defendant's conduct was nothing out of the ordinary.

On October 13 (the day on which the body parts were discovered)

Hinton telephoned defendant at about 6:30 p.m. and arranged to meet her at the apartment of Athena Wade in Champaign. During the conversation defendant stated that she had spent the day visiting a friend in Decatur. After meeting at Wade's, defendant and Hinton left, returned to defendant's home, and there engaged in homosexual conduct at defendant's instigation. At defendant's invitation, Hinton lived with her from October 13 to November 2, 1981, and then returned home to live with her mother. After moving in with defendant, Hinton noticed that the bathroom rugs and shower curtains were missing and that all of Movina's personal belongings were still in the house. During the same period defendant gave away Movina's clothing and weight benches and had a bug shield labeled "Pleasure Pleaser" removed from the brown van; she explained that it reminded her too much of Movina and had "too much of a manly image." Defendant also instructed Hinton that if anyone, particularly his family members, asked about Movina's whereabouts, she was to say that he was not at home but would return "in a little while."

Hinton's testimony continued; on November 4 she, Athena Wade, and Carrie Starks had lunch together and began to voice doubts as to the whereabouts of Movina. Hinton had heard of body parts being discovered in Decatur and placed a telephone call to the Decatur police concerning the matter.

On November 6, 1981, the Decatur police obtained a search warrant for defendant's home. The complaint for warrant, executed by Sergeant Donald Coventry, recites most of Hinton's testimony as set forth above and also similar statements by Athena Wade concerning the presence in the home of Movina's personal property; both Hinton and Wade stated to the police that the bathroom shower curtains and rugs were missing and that the bug shield had been removed from the van. The police, of course, had possession of the garbage bag containing the miscellaneous items, including shower curtains and rugs.

A service station attendant from a station in Rantoul testified that he had removed a bug shield from a brown van early in October 1981 at the request of a black woman. The shield bore the legend "Pleasure Pleaser." A few days later he replaced a headlight in the same van for the same woman who explained that she had been stopped and given a ticket by the police for having only one headlight. A deputy sheriff testified that he had stopped defendant on October 15 at approximately 1:45 a.m. and had given her a warning ticket for having only one headlight. He stated that the van had no bug shield.

A supervisor from Vetter Corporation in Rantoul testified that defendant had been employed there during the month of October

1981. She stated that defendant had told her she was a divorcee and that her ex-husband lived in California with their two children; also that she was dating a man who worked at Kraft Company on the second shift.

Athena Wade testified that she was a friend of defendant and on November 17 picked defendant up to take her for a drink. During the course of the conversation defendant stated to her that she had killed her husband by strangling him with some pantyhose while he slept. On cross-examination Wade admitted that defendant and Movina at one time invited her to participate "in a three-way" with them but that she had declined.

Deborah Lomax, a friend of defendant since high school, testified that defendant visited her home on November 4 and that her husband had inquired of defendant as to the whereabouts of Movina. The husband worked at Kraft Company. Initially defendant stated that Movina was working at the Clinton power plant but later stated that he had gone to California. Defendant returned the next day, November 5, to the Lomax home for another visit. At that time she stated that she was meeting a "new man in her life" and that this man was going to "do nice things for her and take her nice places."

The police executed the search warrant on November 6. At about 9 or 9:30 p.m. on that date defendant called Lomax on the telephone and told her that the police were at her home. When Lomax asked what was wrong, defendant stated to her that she was "in a lot of trouble" because she had killed Movina.

During the same search, defendant made another telephone call which was overheard by an investigator from the Illinois Department of Law Enforcement. According to the investigator, defendant said, "Athena, girl, Mo's dead, and I'm in a lot of trouble."

Another officer from the Illinois Department of Law Enforcement described the bedroom in the Minnis home. He stated that it contained a king-sized waterbed with a wooden headboard but that the sides were padded "rather well."

That was the State's case. Defendant took the stand in her own behalf. She commenced by describing her marital problems with Movina which had their origin in her failure to bring enough women home for sexual encounters with him. She claimed that he had repeatedly subjected her to beatings on account of this. She stated that he wanted other partners because she was not pleasing him enough and that the other women were to teach her how. She approached other women regularly for the purpose and when they declined, Movina would beat her again because he felt she was not trying hard enough.

She then recounted her version of the events commencing with Movina's return from work about midnight on Friday, October 9 through Saturday, October 10 as follows: she was asleep but he awakened her and told her that he had company. She got up, dressed, and went into the living room where Movina introduced her to his friend, Duane, who, he said, was a male prostitute. She sat on the floor watching television, while Movina and Duane went to Movina's weight room. They returned shortly thereafter and placed a heavy set of barbells across her legs which were outstretched on the floor. She was unable to move. They then engaged in homosexual intercourse. Movina stated to her, "If you just do what you're supposed to do, I wouldn't have to do this." After the unnatural act was completed, Movina removed the barbells and she fled to the bathroom to vomit. When she came out, she attempted to leave the house but was restrained by Movina. Both he and Duane then attacked her sexually and later Movina beat her and again sexually assaulted her. He then tied her to the knob on the bedroom door and left the house. He assigned as his reason that he was concerned that she would tell someone about the homosexual intercourse.

She was uncertain when he returned home, but when he did, he was still ranting and raving that she might tell someone about what had happened. He untied her and she went to the bathroom to bathe. He followed and pushed her head into the toilet and repeatedly threatened her with death. He then forced her to perform fellatio on the bathroom floor and next dragged her to the waterbed where he commenced having intercourse with her. He then began to choke her. Her testimony as to what then happened was:

> "So, as he tried to choke me, I almost wanted to die. So, I don't know where—where I got the strength, but I prayed, I prayed for the strength to get him off me just one more time. And all of a sudden, *** I just gave it all I had. And I kicked him off of me ***. I kicked him off with the pressure of my knees being to my chest ***. When I pushed him off, he fell back ***. And when he fell back, he just laid there. I laid there, too. I couldn't even move. And I knew that if he got back up he was going to kill me, but I could not move.
>
>                 * * *
>
> I gave it all I had. If he comes back, I'm just dead. But he didn't get up. And I got up, I went to the corner and I sat in it. That's where I was always supposed to set when *** when I was on punishment or didn't do anything he thought I was supposed to do. I was made to sit in that corner, to sleep in that

corner."

She remained in the corner for some length of time, believing that Movina was watching her. Finally, she got up and went to the bed and touched him; she then realized he was dead. She dragged the body to the bathroom and into the bathtub and then obtained some trash bags and a saw from the garage. She then became aware that it was Monday morning, so she went to Simlin's house to tell him that Movina would not be driving to work at Kraft Company. She returned home and resolved that no one should ever know what had gone on that weekend; to that end, she decided to dismember the body.

Various parts were placed in the trash bags which were then loaded into the van; she then drove to Decatur and there conceived the idea of placing them in garbage dumpsters; this was done and some of the bags were thrown into the Sangamon River; after the bags were disposed of, she began driving and ended up in Chicago.

At this point the defendant's testimony was interrupted while the trial court and counsel engaged in colloquy concerning the battered woman syndrome. The prosecutor argued that the defendant's testimony indicated that the death was an accident and hence he objected to any evidence regarding the syndrome. The court disagreed and characterized the defendant's case as a traditional self-defense one; he expressed doubt that there was anything relevant in the syndrome, since if the jury believed the defendant, no further explanation was needed.

Defense counsel argued that with the evidence of dismemberment before the jury, some explanation of it was necessary since such actions would not be comprehensible to the average juror. He stated, "The state of mind of the defendant at that time [the dismemberment] is crucial. If [the prosecution is] to be allowed to explore this through the dismemberment, we must have some way to deal with it." He then moved for a mistrial and argued that on retrial the court should exclude all evidence of dismemberment and thereby eliminate the problem.

After extensive argument by counsel the court ruled that the evidence of the battered woman syndrome would not be admitted since it would be relevant only to the perception in the mind of the defendant at the time of the killing as to how a battered woman would perceive danger as being imminent even though her batterer was not then in a position to pose immediate danger. With respect to the argument that the syndrome evidence was necessary in order to deal with the dismemberment evidence, the court ruled that "the question of dismemberment has nothing whatsoever to do with the other issue, namely,

the admissibility of the battered woman syndrome ***. [The dismemberment] is a factor which the jury can and should consider and literally has nothing whatsoever to do nor is it tied in any way with the battered woman syndrome."

It is thus apparent that the court ruled solely on the basis of relevancy; the State acquiesced in the ruling and offered no other basis for excluding the evidence. While the State argues on appeal that there was no foundation laid for the qualifications of the experts proffered by the defendant, as described below, this objection was not made at trial. The State was content with the trial court's *sua sponte* ruling on the basis of relevancy.

Defense counsel then sought to make an offer of proof through the expert witness, Dr. Peg McMullen, concerning the applicability of the battered woman syndrome to the facts of this case. He was cut off by the court who said, "I will indicate I'm not too anxious to hear any testimonial offers. *** I think it would be really unnecessary plus a waste of my time in these proceedings ***. What I'm going to say is nothing that she could say would change the ruling. *** But there's no need to actually hear the testimony because it would be much more time consuming."

As a result of this ruling, defense counsel was limited to attaching to his post-trial motion two written reports of experts, Peg McMullen, Ph.D., a clinical psychologist, and Arthur Traugott, M.D., a psychiatrist; plus hospital records of the defendant taken upon two prior occasions.

Defendant's testimony then resumed. She detailed her relationship with Movina and estimated that she had been subjected to a beating at least once a week; further, that Movina would not permit her to have any contact with her children from a prior marriage. She also testified concerning Movina's alcohol and drug usage, stating that on October 10, 1981, the purported date of his death, he had been drinking and snorting cocaine, and had been using cocaine for about a year prior to his death. On cross-examination she admitted to having cashed a check made payable to her by the Kraft Thrift Plan in the amount of $848.46 on the morning of Friday, October 9, 1981. This had also been established in the prosecution's case in chief. This led to some confusion as to the sequence of events. There had been evidence that Thursday was payday for Movina and that the events with the male prostitute and the events following occurred on payday; on this theory the defendant would have been tied up, as above described, all day Friday. Nonetheless, on redirect, she testified that she considered Friday as payday, and that the events began on Friday midnight and

continued throughout the weekend. This became a subject of controversy on final argument.

A couple of actions by spectators in the courtroom during the defendant's testimony have become the subject of further controversy. It appeared that a spectator was shaking her head in a negative fashion. The court removed the jury from the courtroom and then ordered the spectator removed; he then admonished the remaining spectators that no one was to make any gestures, statements, comments, or any other actions designed as a method of criticizing the defendant's testimony. Later there was a similar happening. The court was advised that the jury had heard some derogatory statements concerning defendant's credibility made by a spectator. Defense counsel then moved for a mistrial. The court commented that the spectator was "a none too impressive figure" and offered to inquire of the jury whether they had been influenced by the incident. Defense counsel opposed the procedure, stating that any inquiry would only heighten any potential damage. The court then denied the motion for mistrial.

After all the evidence was concluded, the State moved to admit its exhibits. These included six photographs of the dismembered body taken during the autopsy. Defense counsel objected. The objection was sustained as to two of them and overruled as to the other four, the court holding that they were probative of the question of defendant's credibility of her version as to how she accomplished the dismemberment. A motion for mistrial based on the conduct of spectators was renewed and denied.

A conference on jury instructions was then held. Defense counsel tendered instructions on involuntary manslaughter and voluntary manslaughter as lesser offenses. The court refused the instruction on involuntary manslaughter and also refused defendant's version of voluntary manslaughter which was taken from Illinois Pattern Jury Instruction (IPI), Criminal, No. 7.06 (2d ed. 1981); instead, the court gave the voluntary manslaughter instruction taken from the former 1968 edition of IPI Criminal. This will be discussed in more detail below.

Final arguments were heard, of which more is said below, and the jury returned a verdict of guilty of murder.

In our opinion the most significant issue in this case is the trial court's handling of the battered woman syndrome. We are little concerned with the nature of that syndrome or its potential scope. We are greatly concerned that the defendant was deprived of her constitutional right to present a defense. The trial court, from his study of prior authorities and the legal literature on the subject, arrived at the

fixed and immutable conclusion that the syndrome applies only to explain the woman's conduct at the time of the victim's death, not to events which transpire afterwards. On this basis he excluded the evidence as irrelevant as a matter of law and refused to listen to an offer of proof. This constitutes reversible error.

■ The syndrome is an emerging concept of very recent vintage; its defining characteristics have not yet been firmly established; for these reasons we are not inclined to be critical of the learned trial judge. Defendant concedes that the instant case is unique among the very limited number of cases dealing with the battered woman syndrome. Those courts which have allowed expert evidence on the syndrome have done so only for the purpose of explaining why the abuse a woman has suffered causes her to reasonably believe that her life is in danger and that she must use deadly force to escape her batterer. With respect to that aspect of its probative value, some courts have held it to be error to exclude expert evidence on the battered woman syndrome. (*Ibn-Tamas v. United States* (D.C. App. 1979), 407 A.2d 626; *Hawthorne v. State* (Fla. App. 1982), 408 So. 2d 801; *Smith v. State* (1981), 247 Ga. 612, 277 S.E.2d 678; *State v. Anaya* (Me. 1981), 438 A.2d 892; *Mullis v. State* (1981), 248 Ga. 338, 282 S.E.2d 334.) Other courts have refused to admit evidence on the syndrome. *State v. Thomas* (1981), 66 Ohio St. 2d 518, 423 N.E.2d 137; *State v. Griffiths* (1980), 101 Idaho 163, 610 P.2d 522; and *Buhrle v. State* (Wyo. 1981), 627 P.2d 1374.

The literature, too, is recent. Examples are: Eber, *The Battered Wife's Dilemma: To Kill or To Be Killed*, 32 Hastings L. J. 895 (1981); *Beyond the Juror's Ken: Battered Women*, 7 Vermont L. Rev. 1 (1982); *The Admissibility of Expert Testimony on Battered Wife Syndrome: An Evidentiary Analysis*, 77 Nw. U. L. Rev. 348 (1982). See also Annot., 18 A.L.R.4th 1153 (1982).

■■ It is true that in nearly all the reported cases the syndrome evidence has been utilized, if permitted, as a form of self-defense in a confrontational situation; *i.e.*, the battered woman kills her batterer during or immediately after an attack. However, the instant case is not an ordinary one. We agree that defendant's testimony, if believed by the jury, clearly established that the force she used in throwing her husband off her body and in defending herself was reasonable under the circumstances, and thus expert testimony was unnecessary to explain it. However, her reasons for dismembering his body were very much at issue. The prosecutor used the dismemberment as substantive evidence to prove defendant's consciousness of guilt. A defendant clearly has the right to introduce evidence to rebut the State's evi-

dence of consciousness of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) The State's use of the dismemberment evidence rendered any explanation of it which would be consistent with innocence vital to the defendant's case.

■ By ruling that expert evidence on the syndrome was irrelevant and by denying defense counsel his right to make an offer of proof, the trial court took much too narrow a view of the matter. We must of necessity, then, employ the reports attached to the post-trial motion. Dr. McMullen states that the defendant's conduct both at the time of Movina's death and afterwards was influenced by the fact that she was a battered woman. Dr. Traugott indicated an opinion that defendant's decision to dismember her husband's body was influenced by her emotional reaction to the shock of the situation, presumably including the abuse which defendant claimed to have suffered at the hands of her husband. She testified that she remembered thinking as she sawed his hands off, "At least he won't beat me no more ***. I hated his hands. They hurt me so bad." These reports make out a *prima facie* case of relevancy of the expert testimony. Whether it would be believed by a jury is beside the point. The defendant had a right to present evidence relevant to her explanation of her conduct, no matter how far-fetched it might appear to the average individual. We do not agree with the trial court that the dismemberment was an entirely separate and distinct issue. The State used it and exploited it thoroughly as it was entitled to do. By the same token, the defendant was entitled to rebut it if she could. The experts' reports indicate that the syndrome might extend to the dismemberment and thus their testimony became extremely relevant.

The State does not argue otherwise. Instead, their principal argument is directed at the foundation; first, as to the qualifications of the experts, and second, as to the existence of the syndrome itself. The brief, but pointed, answer to that contention is that the State did not raise such an objection at trial. When the court announced that he was ruling on the basis of relevancy, the prosecutor said nothing more but was apparently content to ride along on that ruling. The reports in the record admittedly contain little information concerning the experts' background and empirical studies, but the defendant should not be required to include in her offer of proof matters which were not contested. As to the second point, the trial court at its ruling on the motion *in limine* recognized the existence of the syndrome as sufficiently developed to warrant expert testimony. He changed his mind only because of the narrow view which he took of it. The defendant has provided the trial court and this court with a sufficient general

understanding of the evidence she sought to introduce. She has demonstrated that the ruling was in error and that the evidence might have produced a different result at trial.

Defendant's second argument is that the State failed to disprove her claim of self-defense beyond a reasonable doubt. Although we have already held that the exclusion of the expert evidence on the battered woman syndrome is an error of sufficient gravity to warrant a new trial, it does not follow that the record as it appears without that evidence does not disclose that the State has sustained its burden of proof.

Defendant argues that the State relied heavily, almost entirely, upon her admission by conduct and her inconsistent statements concerning her husband's whereabouts. However, the evidence was very much in conflict.

Defendant claimed that Movina died as a result of hitting his head on the bed frame after she pushed him off of her body during his attempt to strangle her and to force intercourse upon her. As against this contention is her statement to her friend Athena Wade, made after her arrest and release on bond, that she strangled him with a pair of pantyhose while he slept. There were additional admissions made to Wade and to Lomax by telephone during the police search of the house on November 6.

Other inconsistencies appear in the record. Defendant claimed that Movina threatened to kill her so that she would not reveal his homosexual activity. This appears rather vaporous in view of his frequenting a well-known homosexual bar. She also claimed to have received a severe beating just prior to Movina's death, yet Hinton testified that during her homosexual encounter with defendant on the night of October 13, when they were both naked and the lights were on, she observed no signs of injury on defendant's body. Defendant also claimed that the death occurred during an act of forced intercourse; yet the lower torso of Movina's body was clothed when it was found. We need not reiterate the various accounts which defendant gave of Movina's whereabouts during the days following October 10. They are set forth in detail above. These weigh heavily against her credibility.

■ Once a jury has decided the question of self-defense, a reviewing court will not disturb that finding unless upon the evidence no rational trier of fact could find guilt beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 317, 61 L. Ed. 2d 560, 572, 99 S. Ct. 2781, 2788.) We cannot so find on this record.

Defendant next argues that the actions of the spectators, as de-

scribed above, and the subsequent denial of a mistrial deprived her of a fair trial. We do not agree.

The incidents appear to be relatively minor and certainly do not attain the extreme found in *People v. Herbert* (1935), 361 Ill. 64, 196 N.E. 821. In that case, during the examination of the defendant in a homicide trial, the victim's widow stood up in the rear of the courtroom and shouted, "You dirty, lying thing, you! How dare you sit there and say that! You dirty liar!" The supreme court held that this was not grounds for mistrial.

In the first instance here, the court removed the spectator and cautioned those remaining against any such further conduct. In the second instance, the court offered to poll the jury, but the defendant declined the offer. The declaration of a mistrial for reasons of this kind is within the trial judge's discretion because he is in the best position to assess potential prejudice. (*People v. Holmes* (1974), 19 Ill. App. 3d 814, 313 N.E.2d 297.) Here the trial judge found no prejudice and the defendant has failed to demonstrate that her motions for mistrial were improperly denied.

Defendant's next issue is that of improper closing argument by the prosecutor. The arguments, as might be expected in a case of this nature, were lengthy and heated. However, there was only one untimely objection made by the defendant after the jury had retired to deliberate and no mention of closing argument was made in defendant's post-trial motions. We therefore consider the matter waived. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

Defendant next argues that the trial court erred in permitting the jury to view photographs which she claims were gruesome and inflammatory; they were of the decedent's body parts assembled in the autopsy room. Defendant argues that since she did not dispute the dismemberment, the photographs were not probative of any issue nor could they reflect upon her credibility.

The principles governing the matter are well known. Photographs depicting the condition of the decedent are normally admissible as probative of one or more issues in a homicide prosecution. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) The fact that they are gruesome is no bar to admissibility. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) Likewise, it is no bar that they are cumulative to oral testimony covering the same issue. *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.

The photographs here were properly admitted to corroborate and explain the pathologist's testimony concerning identification of the victim and the reasons why he was unable to make a sound medi-

cal determination as to the cause and time of death. Furthermore, they exhibit what appears to be a methodical dismemberment. This discredits defendant's testimony that she committed the act in a Lizzie Borden-type of frenzy. The trial judge carefully considered all of the photographs and in fact rejected several of them. It was his discretion which is controlling. (*Foster.*) We cannot say that it was abused and the defendant has failed to demonstrate error.

Defendant's final contentions relate to the manslaughter instructions: first, the refusal of the instruction on involuntary manslaughter, and second, the giving of a former IPI Criminal instruction on voluntary manslaughter.

■ As to the first, we find that it was properly refused. The gist of involuntary manslaughter is recklessness. (*People v. Simpson* (1978), 74 Ill. 2d 497, 384 N.E.2d 373.) Under defendant's theory of the case, the death was the result of either self-defense or an accident; if self-defense, it was intentional, not reckless; if an accident, she is not guilty of anything. There was no error in refusing the instruction on involuntary manslaughter as an included offense.

The second problem is much more complex. Defendant submitted a voluntary manslaughter instruction cast in the form of IPI Criminal No. 7.06 (2d ed. 1981) as follows:

> "To sustain the charge of voluntary manslaughter, the State must prove the following propositions:
>
> First: that the defendant performed the acts which caused the death of Movina Minnis; and
>
> Second: that when the defendant did so, (1) she intended to kill or do great bodily harm to Movina Minnis; or (2) she knew that her acts would cause death or great bodily harm to Movina Minnis; or (3) she knew that her acts created a strong probability of death or great bodily harm to Movina Minnis; and
>
> Third: that when the defendant did so she believed that circumstances existed which would have justified killing Movina Minnis; and
>
> Fourth: that the defendant's belief that such circumstances existed was unreasonable; and
>
> Fifth: that the defendant was not justified in using the force which she used."

The State objected, but was properly overruled. The evidence was sufficient to warrant giving an instruction on voluntary manslaughter as an included offense. However, the court refused defendant's instruction and gave its own instruction taken from IPI Criminal No. 7.06 (1968), as follows:

"To sustain the charge of voluntary manslaughter the State must prove the following propositions:

First: that the defendant intentionally or knowingly killed Movina Minnis; and

Second: that when the defendant did so she believed that circumstances existed which would have justified killing Movina Minnis; and

Third: that the defendant's belief that such circumstances existed was unreasonable."

The trial court's theory apparently was that the revised 1981 instruction did not state the law. We disagree.

Section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)) sets forth the mental states for murder: either the defendant (1) intends to kill or intends to do great bodily harm or knows that such acts will cause death, or he (2) knows that such acts create a strong probability of death or great bodily harm. In other words, he must act intentionally or knowingly.

Section 9—2(b) of the Code sets forth the mental state required for the form of voluntary manslaughter with which we are dealing. It states:

"A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

In our opinion the legislature was simply using a shorthand method of reiterating the mental states for murder in the voluntary manslaughter section. We believe that the drafters of the revised IPI Criminal had this in mind when they made the change.

One author has characterized voluntary manslaughter as "murder *plus* extenuating circumstances." O'Neill, *"With Malice Toward None": A Solution to an Illinois Homicide Quandry*, 32 DePaul L. Rev. 107 (1983).

Under Supreme Court Rule 451(a) (87 Ill. 2d R. 451(a)) it was the duty of the trial court to use IPI Criminal (2d ed. 1981) unless such an instruction did not accurately state the law. We believe that IPI Criminal No. 7.06 (2d ed. 1981) does accurately state the law and the court was in error for refusing it. Since the case must be retried, this error is not likely to happen again.

Because of the exclusion of expert evidence concerning the battered woman syndrome, defendant's conviction is reversed and the cause is remanded for a new trial.

Reversed and remanded for new trial.

GREEN, J., concurs.

JUSTICE TRAPP, concurring in part and dissenting in part:

I concur in the conclusion that the trial court erred in excluding the expert testimony explaining the battered wife syndrome, but dissent from the opinion insofar as it approves or accepts defendant's argument that such testimony is admissible to rebut the inference of guilt arising from the dismemberment of the body, and to rehabilitate defendant's credibility upon her testimony that she killed Minnis in self-defense or by misadventure during a physical struggle.

Defendant's brief takes the position that upon all of the evidence dismemberment was not the cause which occurred separately and subsequently to death and that the prosecution's theory was that strangulation was the cause of death.

The full thrust of defendant's argument upon the exclusion of this testimony is stated in the language of the brief:

"Having relied upon a defense of self-defense, the trial court's ruling was prejudicial because the credibility of the defendant's version of the events surrounding her husband's death depended upon her ability to explain why she disposed of his body as she did."

In *People v. White* (1980), 90 Ill. App. 3d 1067, 414 N.E.2d 196, defendant testified to shooting in self-defense as her live-in man was beating her. The trial court excluded defendant's testimony concerning the syndrome over defendant's argument that the testimony "*** had a direct bearing on the credibility of the defendant as regards her claim of self-defense." (90 Ill. App. 3d 1067, 1072, 414 N.E.2d 196, 200.) The evidence was held to be irrelevant and immaterial for the reason that self-defense is determined by the trier of fact upon what transpired at the "particular instant" that death was caused. See also *State v. Thomas* (1981), 66 Ohio St. 2d 518, 423 N.E.2d 137.

Defendant's motion *in limine* prior to trial recognized this rationale by her contention that dismemberment was irrelevant and immaterial because it was subsequent to the death. It is argued that the trial court would have admitted the testimony if the only evidence was that decedent Minnis was killed while asleep. Upon the event, defendant elected to testify that she killed by misadventure or in self-defense in the belief of imminent danger during a physical struggle and, in effect, abandoned the rationale of the battered wife syndrome. As in *White*, I do not agree that she can use the opinion evidence of

the battered wife syndrome to support her credibility as to the testimony concerning a desperate struggle.

I agree that the testimony was admissible upon the sum of the reasons that the prosecution charged murder by strangulation or other unknown means, that some evidence of strangulation was introduced by the prosecution through a purported admission by defendant, and that the State strenuously argued that defendant was guilty of murder in a context which would require the jury to completely reject defendant's testimony of a struggle which resulted in the death of the husband.

I agree that the evidence of the battered wife syndrome would be admissible if the jury accepted the theory of the prosecution that death was caused by strangulation or other unknown means while the victim was asleep and that since the jury was required to choose between the theory of the prosecution as to the cause of death and the defendant's theory of the cause of death, the evidence concerning the syndrome would be relevant if the jury was persuaded that the victim died by strangulation or other unknown means.