THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN L. TURK (Impleaded), Defendant-Appellant.

First District (5th Division)    No. 79-2024

Opinion filed October 9, 1981.—Supplemental opinion filed on denial of rehearing November 20, 1981.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of the murder of Milton Daniels and the attempt murder and aggravated battery of Angela Lusk. He was sentenced to three concurrent terms of imprisonment of not less than 50 nor more than 100 years. Defendant appeals, contending that: (1) he was denied a fair trial when the jury was improperly instructed as to the intent requirement for the offense of attempt murder; (2) the prosecutor's closing arguments were prejudicial and deprived him of due process of law; and (3) the trial court abused its discretion in imposing a sentence not considerate of restoring him to useful citizenship.

The pertinent evidence adduced at trial can be summarized as follows:

In April of 1976, Angela Lusk lived in an apartment on the second floor of a high-rise building in Chicago with her fiance, Milton Daniels, and one Leroy Damon. On April 25, 1976, she had a conversation with Damon, who was using narcotics, about the theft of her fur stole. He told her that he was getting narcotics from James Everette, who lived on the fifth floor of the building. She later ordered Damon to leave her apartment. That night, Lusk and Daniels went upstairs to Everette's apartment, but he was not home. They left a message for him to come down to their apartment when he returned.

At about midnight, Everette came down to Lusk's apartment. Everette told Lusk, who was alone, that Damon had given him her fur stole, and that it was in the possession of one of his friends. He then went into her bedroom, placed his gun on the dresser and took all of his clothing off. He told her that he would return her fur if she had sex with him, and when she refused, he dressed and left the apartment. When Daniels returned, Lusk told him what had transpired. Daniels later met with Everette to discuss the whereabouts of the fur.

The following morning, Lusk and Daniels went up to Everette's apartment and told him not to worry about the fur stole, and that she "was going to let the police handle it." They then returned to her apartment and called the police. Meanwhile, Daniels placed a gun in the back of his pants. Minutes later, Daniels answered a knock at the door. He let Everette and defendant into the apartment. Everette immediately pulled out a gun. Defendant also had a gun drawn and pointed it at Lusk. Lusk

had never seen defendant before, and his name was never mentioned in connection with the disappearance of her fur stole.

Everette said that he was "tired of being hassled." Lusk told him that his actions were "not necessary," and that she had already called the police. However, defendant told them to "shut up and get on the floor." Everette approached Lusk and Daniels, who were kneeling on the floor. While defendant kept his gun trained on them, Everette struck Daniels with a pair of handcuffs that he was carrying, and also slapped Lusk with the back of his hand. Then, Everette handcuffed Daniels' hands behind his back. Grabbing him by the arm, Everette led Daniels into the bathroom. As Everette stood outside the bathroom door, Lusk suddenly stood up and said, "Lord, have mercy." Defendant, who had previously told her not to move, shot her twice in the legs. Lusk fell on her side behind a chair that faced the couch. While on the ground, she was able to see the hallway where Everette stood. Everette, who was grinning, stated, "this nigger got a gun," and then fired his gun about five times inside the bathroom. Daniels screamed out Lusk's name a few times, but after the shots, he said nothing.

Lusk, who remained on the floor, played dead. She opened her eyes once and noticed defendant, who was standing near the door to the apartment. He opened the door, looked outside, returned and stated "we're not going to be able to make it out of here." Everette replied, "shoot that bitch in the head." Lusk then felt a gun on the skin behind her ear. Somebody shot her in the head and she felt numb and "saw red." A short time later, the police appeared at the scene.

Officer Edward Bluett of the Chicago Police Department arrived at Lusk's apartment between 10:30 and 11:00 a.m. on the day of the incident to take a theft report. Bluett took the stairs to the second floor apartment. While in the stairwell, he heard three or four loud banging noises in succession, but did not know what those noises were. When he arrived at Lusk's apartment and knocked on the door, someone inside yelled, "help, please, help, please." With revolver drawn, Bluett entered and saw Lusk and Daniels on the living room floor bleeding. Defendant stood over Daniels and was wiping his hands on a towel. Bluett ordered defendant to drop the towel, raise his hands and come out into the hallway. One of the residents of the building assisted the police officer in handcuffing defendant. With his foot in the apartment door, Bluett radioed for assistance. He then saw Everette come out of the bedroom area of the apartment wearing a bathrobe. When Everette saw Bluett, he attempted to close the apartment door. Bluett ordered Everette to lie down on the floor, but the latter ignored him, retrieved two pairs of handcuffs from the front room floor and walked back into the bedroom area.

Soon, two other police officers arrived. Bluett and one of the officers

found Everette in the bedroom holding the two pairs of handcuffs. Everette, who was bleeding from a gunshot wound to the leg, was placed under arrest, handcuffed to defendant and brought to the police station.

The officers found Lusk in the living room of the apartment with her head positioned behind a chair and her feet at the center of a table, while Daniel's head rested near a television, with his feet towards a chair. Lusk was speaking incoherently. A knife was found on the floor near her head. Daniels was also alive and mumbling that he could not breathe. A .38-caliber Smith and Wesson revolver was found beneath his head. Expended .25-caliber shell casings were also recovered from the living room floor and from the top of a coffee table.

The officers searched the apartment for a gun to match the expended cartridges. They only found a .38-caliber five-shot revolver on a vanity across from the bathroom. Blood was splattered all over the bathroom toilet, sink, bathtub and floor, and there was another expended .25-caliber in the sink. One of the officers noticed two broken window panes in the bathroom, and later investigated the gangway under the window on the theory that a weapon may have been thrown through it to the ground below.

Later that day, Lusk was examined by Dr. Javid Hekmatpanah, a neurosurgeon. According to his testimony, the victim had paralysis of the arms and of the legs, which was caused by a bullet which had entered the left side of her neck, passed through her spinal cord, and lodged underneath the skin on the right side of the neck. Lusk also had six bullet wounds in her thighs; four on the right and two on the left. These wounds were "through and through," and the bullets exited her body.

Daniels was examined by Dr. Yuksel Konacki an assistant Cook County Medical Examiner. In his opinion, Daniels' death was caused by two bullet wounds, one to his right shoulder and one to the right side of his chest.

It was stipulated between the parties that Everette's bond was forfeited for his failure to appear in court, and a warrant was issued for his arrest.

Four character witnesses then testified on defendant's behalf as to his good reputation for being a peaceful, law abiding and truthful person.

Defendant, John Turk, testified on his own behalf that on April 26, 1976, he had been unemployed for two weeks and went to a construction site at 24th and Pulaski in Chicago at about 7 or 8 a.m. to search for work. Since he was not hired, he caught a bus to a White Castle at 79th and Pulaski, bought some hamburgers and a newspaper, and then took another bus to 71st and Jeffrey. Defendant, who had performed services for Everette in the past, proceeded to Everette's apartment in order to put some locks on the door and bathroom of his apartment. He had known

Everette since November of 1975 and was aware that he was a drug dealer. Defendant arrived at Everette's apartment at about 9 a.m., but could not immediately start the work since it was "too early to be banging on any doors." He read his newspaper, ate his hamburgers and slept for about an hour. Defendant was then awakened by a knock at the door. Everette answered the door and went into the hallway, closing the door behind him. Defendant did not hear or recognize the voices of the people to whom Everette was speaking.

About 10 minutes after Everette returned, he stated to defendant: "John, I have a beef with some people downstairs, I want you to go downstairs with me." They took the elevator to Lusk's apartment. Defendant had no knowledge of any stolen fur and did not know Lusk, Daniels or Damon. Everette knocked on the door and Daniels allowed them into the apartment. Then, Everette pulled out a gun and ordered Daniels and Lusk to get on the floor. This was the first time defendant saw a gun in Everette's possession. Defendant had no gun that morning and said nothing to Lusk or Daniels. He merely remained near the apartment door.

Everette told Lusk that he did not take her fur. She replied, "I didn't say you took it," and was then slapped by Everette. Daniels got up from the floor and ran toward the bathroom. Everette chased Daniels. At this point, defendant ran down the hallway and heard shooting. After he reached the end of the hallway, about 15 or 20 yards away, he stopped, listened to the shots, and returned to the apartment. Entering, he saw Everette in the living room between the bathroom and the bedroom striking Daniels about the head with two sharp objects that he held in each hand. Shortly thereafter, the police arrived. Defendant denied shooting Lusk or Daniels, and stated that Everette did not order him to shoot Lusk in the head. On cross-examination, defendant admitted that he had been convicted on October 28, 1969, of criminal trespass to a vehicle and sentenced to six months probation.

Other relevant facts will be discussed during the analysis of the issues raised on appeal.

## Opinion

Defendant first contends that he was denied a fair trial when the jury was improperly instructed as to the intent requirement for the offense of attempt murder. The tendered definitional instruction for attempt murder reads as follows:

"A person, or one for whom he is responsible commits the crime of attempt, who, with the intent to commit the crime of murder, does any act which constitutes a substantial step toward the commission

of the crime of murder. The person, or one for whom he is responsible, must have intended to kill."

The crime attempted need not have been committed. The jury was also given the "issue" attempt murder instruction:

"To sustain the charge of attempt, the State must prove the following propositions:

First: That the defendant performed an act which constituted a substantial step toward the commission of the crime of murder; and

Second: That the defendant did so with the intent to commit the crime of murder.

If you find from your consideration of all the evidence that each of these propositions had been proved beyond a reasonable doubt, then you should find the defendant guilty. If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."

Finally, the jury received the definitional murder instruction:

"A person, or one for whom he is responsible, commits the crime of Murder, who kills an individual if, in performing the acts which cause the death,

He, or one for whom he is responsible, intends to kill or do great bodily harm to that individual; or he, or one for whom he is responsible, knows that such acts will cause death to that individual; or he, or one for whom he is responsible, knows that such acts create a strong probability of death or great bodily harm to that individual."

Defendant asserts that these instructions, when read in conjunction with each other, are erroneous and misled the jury into believing that defendant's attempt murder conviction could be sustained on a finding that he intended to cause great bodily harm to Lusk, instead of the required finding that he intended to kill her. The defect or ambiguity in the instructions allegedly arises from the conflicting intent requirements found in the definitional and the issue instructions for attempt murder. The former instructs that defendant, to be guilty, must have "intended to kill," while the latter states that he must have had the "intent to commit the crime of murder." The meaning of "intent to kill" is self-explanatory. However, "intent to commit the crime of murder" is described by the definitional murder instruction as intent to kill, or, *inter alia*, to "do great bodily harm to that individual." Hence, defendant argues the jury may well have concluded that proof of his specific intent to kill was unneces-

sary in order for them to return a guilty verdict of attempt murder, and that a lesser showing of his intent to do great bodily harm would suffice.

In response, the State argues that any alleged defects in the instructions are waived by defendant by his failure to sufficiently object to them at trial and in his motion for a new trial. The State also maintains that the instruction properly informed the jury of the required specific intent to kill, and alternatively, that any alleged error contained therein is harmless. We shall first address the waiver issue.

■■ At the instructions conference, defense counsel objected to both the definitional and the issue attempt murder instructions on the basis that they did not adequately convey to the jury that attempt murder is a specific intent crime. Considerable discussion was given this matter by the prosecutor and defense counsel in the trial court's presence. In addition, defendant specifically listed these instructions as erroneous in his written motion for a new trial. The reason for the waiver rule is that timely objections to defective instructions permit the court to correct the defects before the instructions are given and do not therefore permit a party failing to object to gain the advantage of obtaining a reversal based upon his own failure to act. (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331.) In our opinion, defense counsel's objections to the instruction made at the instructions conference and in the motion for a new trial gave the trial court sufficient notice of the issue that is now before us on review. Invocation of the waiver rule is, therefore, inappropriate.

■■■ Turning to the propriety of the tendered instructions, we start with the undisputed rule that to obtain a conviction for attempt murder, the jury must be unambiguously instructed that defendant had the intent to kill the victim; intent to cause great bodily harm is not enough. (*People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) As we have discussed, the jury in this case was informed in the definitional instruction for attempt murder that proof of defendant's "intent to kill" was required, yet was also told in the issue instruction that "intent to commit murder" need be proven. The offense of murder, however, does not always require specific intent to kill. Specific intent to do grave bodily harm or knowledge that one's actions will cause or could cause death or bodily harm are also sufficient mental states for murder. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a).) Thus, we believe that the instructions are erroneous since they could have permitted the jury to return a verdict of guilty of attempt murder upon evidence that defendant only intended to cause the victim great bodily harm short of death.

Our supreme court has held, however, that where the intent to kill is "blatantly evident from the circumstance," error in the jury instructions can be deemed harmless. (*People v. Jones* (1979), 81 Ill. 2d 1, 10, 405 N.E.2d 343, 346; see also *People v. Lindsay* (1978), 67 Ill. App. 3d 638, 384

N.E.2d 793.) In *Jones*, defendant, a juvenile, and his adult accomplice approached a man on the street who was waxing his car. Armed with weapons, they seized his wallet and brought him to an abandoned house. As the man was marched toward the house by the assailants, he was knocked to the ground due to several blows he received to the back of his head. Medical testimony adduced at trial revealed that the victim suffered four gunshot wounds to the back of his head and to his back. Defendant admitted participating in the robbery, but denied any involvement in the shooting, alleging that he fled from the abandoned house when his accomplice ordered him to shoot the victim.

Upon his conviction for attempt murder and armed robbery, the defendant in *Jones* alleged that the attempt murder instruction and the definitional murder instruction were fatally deficient, since the former incorporated by reference the latter, which included mental states other than the specific intent to kill. The court held the error in the instructions to be harmless, noting that the defendant's intent to kill was obvious from the facts of the case, and that the only question was whether the defendant was the perpetrator or one of the perpetrators. The court distinguished earlier cases where the evidence was not evaluated to determine whether it was so overwhelming as to withstand the damage of erroneous attempt murder instructions, (*Harris; Trinkle; People v. Tamayo* (1978), 73 Ill. 2d 304, 383 N.E.2d 227) on the basis that, in those cases, defendants' intent to kill was highly questionable.

We find the harmless error doctrine espoused in *Jones* to be applicable to the instant case in light of the abundant evidence of defendant's intent to kill Lusk. Here, as in *Jones*, defendant alleged that he fled from the scene of the crime, and denied participating in the shooting. Likewise, the issue in this case was whether defendant was one of the perpetrators. The jury in the instant case rejected defendant's testimony and chose to believe that of the victim. Lusk testified that defendant ordered her to "shut up and get on the floor," and later shot her twice in the legs. On Everette's command, someone shot Lusk at point blank range behind her ear, paralyzing her. From these actions, intent to kill is clear.[1]

Defendant argues that the error created by the instructions cannot be harmless since there is evidence that Lusk was neither shot at close range nor in a calculated manner. Defendant points to Officer Bluett's testimony that he heard three or four noises in succession while in the stairwell, and also stresses the absence of physical evidence corroborating a close range gunshot wound, in an effort to show that Lusk was hit in a "shoot-out" rather than in the way she described. According to defendant, this evidence, if believed by the jury, would have shown that defendant did not

---

[1] It is irrelevant, of course, as to which of the two assailants actually shot Lusk, since they are legally accountable for each other's conduct.

intend to kill the woman. This argument is without merit. The testimony and physical evidence shows that Daniels was shot while in the bathroom, nowhere near Lusk. Furthermore, Bluett did not even identify the banging noises as gunshots, nor did he state that they came from Lusk's apartment. As to the absence of corroborating evidence of the point blank range of the shot, it is apparent that the jury preferred Lusk's testimony to that of defendant and was satisfied with her explanation of the wound to her neck. Therefore, we believe that even if a corrected instruction had been given, the jury could only find that defendant acted with specific intent to kill Lusk and was guilty of attempt murder.

Defendant next contends that he was denied a fair trial by the prosecutor's closing arguments to the jury. More specifically, defendant asserts that certain of the prosecutor's comments improperly suggested that he ingested drugs during his visit to Everette's apartment on the morning of the crime. Those remarks were as follows:

"PROSECUTOR: The first thing he does when he gets to Everette's place, he doesn't fix the lock; what does he do? The first thing, he eats the hamburgers, then he falls asleep. Now what do you suppose it is, ladies and gentlemen, that would cause him to be sleepy so soon after arriving at a known dope dealer's house? What do you suppose it would be? What do you suppose would cause you to have a strange look in your eye when you went down to another person's apartment?

DEFENSE COUNSEL: Objection, Judge, there is no testimony about that.

THE COURT: Sustained as to the strange look in the eye."

Reference to these remarks is not made in defendant's written motion for a new trial. The motion for a new trial only generally alleges that the closing arguments were inflammatory, prejudicial, invaded defendant's right to counsel and "exhorted the jury to convict the defendant based on matters which [are] dehors the record in violation of the defendant's rights under the Sixth and Fourteenth Amendment to the United States Constitution." At oral argument on the motion for a new trial, defense counsel neglected to allege the impropriety of these particular remarks. In fact, defense counsel emphasized as error another comment not raised for review, wherein the prosecutor allegedly informed the jury that defendant had lied to his lawyer.

Based upon these facts, we hold that the remarks in question were not sufficiently brought to the attention of the trial court and are therefore waived for purposes of review. See *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454.

Finally, defendant contends that his sentences are excessive. Defendant first argues that his sentence for aggravated battery must be

reduced since it exceeds the maximum period allowed by statute. He also maintains that his sentences for murder and attempt murder should be reduced since they do not consider defendant's potential for rehabilitation.

We agree with defendant that he was improperly sentenced for the crime of aggravated battery. After the jury returned its verdict of guilty for the murder of Daniels and the attempt murder and aggravated battery of Lusk, the trial court entered judgment on the findings for all three offenses. Defendant elected to be sentenced pursuant to the law as it existed at the time of the offense. (Ill. Rev. Stat. 1979, ch. 38, par. 1008—2—4(b).) After the sentencing hearing, defendant was sentenced to three concurrent terms of no less than 50 nor more than 100 years in the penitentiary. The offense of aggravated battery, a Class 3 felony, as it existed in April of 1976, provided for a minimum sentence of one and a maximum of ten years, and the minimum sentence could be no greater than one-third of the maximum. (Ill. Rev. Stat. 1975, ch. 38, pars. 12—4(a), 1005—8—1(b)(4), (c)(4).) Since defendant's sentence of 50 to 100 years clearly exceeds the applicable statutory range, his sentence for aggravated battery is hereby vacated and remanded for proper concurrent sentencing.

■■ We do not agree, however, with defendant's contention that the trial court abused its discretion in sentencing him to 50 to 100 years for the offense of murder and attempt murder. Nor do we accept his argument that the sentences imposed are not considerate of the constitutional objective of restoring him to useful citizenship. (Ill. Const. 1970, art. I, §11). It is well established that a reviewing court may alter the sentencing judge's disposition only upon a finding of an abuse of discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Before setting the sentence, the court noted the seriousness of the crimes for which defendant stands convicted, which involved "the death of one person and the living death of another." The trial court also considered defendant's prior conviction for criminal trespass to vehicle. On the other hand, the trial court specifically acknowledged defendant's family background and "* * * grieve[d] for the defendant's family, his wife, his three children." Also brought to the trial court's attention were the following factors pertaining to defendant's rehabilitation: his strong family ties, his good employment record, that he was 40 years old with no history of violent crimes; and that he was convicted under an accountability theory. The record reflects that the sentence bestowed upon defendant by the court was rendered after full consideration of all factors presented in aggravation and mitigation. In light of the heinous nature of the offenses committed by defendant, we see no reason why his sentences should be disturbed.

For the reasons stated, the judgment of the circuit court is affirmed. Defendant's sentences for murder and attempt murder are affirmed. His sentence for aggravated battery is vacated and this cause is remanded for resentencing on that crime alone.

Affirmed in part; vacated and remanded in part.

SULLIVAN, P. J., and MEJDA, J., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. JUSTICE LORENZ delivered the opinion of the court:

In his petition for rehearing, defendant contends that this court improvidently ruled on two of the issues raised for review. First, defendant argues that we erroneously waived the issue concerning the allegedly improper remarks by the prosecutor in closing arguments. Second, it is maintained that the tender of the erroneous attempt murder instruction to the jury is not harmless error as we have held, but constitutes reversible error and requires a new trial.

As to the first contention, defendant claims that the issue concerning the prosecutor's comment suggesting defendant's use of drugs on the morning of the offense was sufficiently brought to the trial court's attention since it was objected to at trial and included in his motion for a new trial. We believe this contention to be without merit.

Contrary to defendant's assertion, it is our opinion that this issue was neither raised with sufficient specificity in the motion for a new trial, nor was it objected to at trial. As a result, no opportunity was given to the trial judge to review his own ruling, and we were deprived of the benefit of that ruling. Recently, in *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337, our supreme court emphasized the importance of specificity in post-trial motions and described its purpose as threefold:

"First, it allows the decision maker who is most familiar with the events of the trial, the trial judge, to review his decisions without the pressure of an ongoing trial and to grant a new trial if, on reconsideration, he concludes that his earlier decision was incorrect. [Citations.] Second, by requiring the statement of the specific grounds urged as support for the claim of error, the rule allows a reviewing court to ascertain from the record whether the trial court has been afforded an adequate opportunity to reassess the allegedly erroneous rulings. Third, by requiring the litigants to state the specific grounds in support of their contentions, it prevents them from stating mere general objections and subsequently raising on appeal arguments which the trial judge was never given an opportunity to consider. (Citations.)" *Brown*, 83 Ill. 2d 344, 349-50, 415 N.E.2d 337, 339.

■■ An examination of defendant's post-trial motion reveals that it fails to meet the criteria set forth in *Brown*, since the trial judge was afforded no opportunity to rule on the issue presented for review. The inadequacy of the motion for a new trial in this case is made apparent by the conspicuous absence of the specific remarks now claimed to be erroneous. Instead, the motion merely claims that the arguments were "inflammatory, prejudicial and invaded the defendant's Sixth Amendment right to counsel and exhorted the jury to convict the defendant based on matters which [are] dehor [*sic*] the record in violation of defendant's rights under the Sixth and Fourteenth Amendments of the United States Constitution." Normally, omission of the specific remark alleged as erroneous from the motion for new trial precludes its consideration on appeal. (See *People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 374 N.E.2d 904.) The failure to include the specific comment must be viewed as fatal for purposes of review in this particular case since its mention was again neglected at the hearing on the motion for a new trial. At the hearing, defense counsel only argued that error in closing argument occurred when the prosecution "* * * said to the jury that John Turk had even lied to his lawyer." Hence, the trial judge was not made aware of the remark now complained of.

Defendant argues that we have overlooked defense counsel's statement to the trial court at the hearing that his failure to "argue the totality of the motion" should not be construed as his abandonment of it. We have not overlooked this statement. Indeed, we also note defense counsel's next statement at the hearing: "I see no useful purpose in going back into arguments we have extensively had at one time or another already." Turning to the record, it is evident that there were neither extensive arguments nor objections made to the prosecutor's inference of defendant's drug use on the day of the crime.

During closing arguments, defense counsel chose not to object to the prosecutor's remarks questioning defendant's behavior in going to a "known dope dealer's house." Rather, objection was only interposed to the reference to the "strange look" in defendant's eye when he was at the victim's apartment. The trial court sustained the objection "as to the strange look in the eye." Defense counsel did not request that the court encompass the rest of the prosecutor's comment in the sustained objection, nor did he ask that the jury be admonished to disregard it. It is clear from this exchange that defense counsel did not object to the inference of defendant's drug use, but only to the fact that there was no testimony as to the "strange look" in defendant's eye at the time of the crime. Earlier, during the direct examination of the victim, defense counsel's objection was sustained to her testimony that defendant looked "strange" and "mean," on the grounds that it "call[ed] for a conclusion." The objection at closing arguments was no more than a renewal of this earlier objection and was properly sustained on this basis. Since no objections were raised

at trial to the remarks concerning defendant's use of drugs, it cannot be said the general assertions contained in the motion for a new trial sufficiently alerted the trial judge to this issue.

Defendant cites *People v. Rivera* (1978), 62 Ill. App. 3d 401, 378 N.E.2d 1293, in support of his position that his post-trial motion is sufficiently specific to preserve the alleged error in closing arguments. In *Rivera*, the court found that defendant's motion for a new trial contained sufficient particularity to afford the trial court identity of the error in the prosecutor's closing argument (*i.e.*, that defendant's prior conviction was evidence of guilt in the pending prosecution). The motion stated that the State's Attorney's "prejudicial inflammatory and erroneous statements in closing argument" denied him a fair trial. However, in *Rivera*, the point raised in the motion for a new trial and on appeal was specifically objected to at trial, unlike in the instant case. In addition, there is no indication in that case that defendant pointed to a prosecutor's remark at the hearing on the motion for a new trial that differed from the one offered on appeal. Therefore, *Rivera* is distinguishable from this case and is of no aid to defendant.

Defendant next contends that our holding that no reversible error occurred when the jury received an erroneous instruction on attempt murder is based upon a misapprehension of facts. In short, he argues that his intent to kill Lusk is not evident from the testimony adduced at trial.

Defendant first relies on Officer Bluett's failure to hear the isolated gunshot Lusk testified had been fired following Daniels' shooting when the assailants detected the presence of the police. According to defendant, this testimony lends support to his theory that Lusk was not shot in the manner she described, but was the victim of a stray bullet in a shootout between Everette and Daniels. However, as we have previously stated, Bluett did not identify the three or four noises he heard while in the stairwell as gunshots, nor did he state that they came from Lusk's apartment. It is noteworthy that Bluett did not draw his revolver after hearing these noises. Hence, his testimony fails to show that the noises were related in any way to the commission of the crime, or that it would have been likely for him to hear the single gunshot which followed the others. Moreover, since these noises were not identified as gunshots, the jury could have properly concluded that all of the shooting, including the isolated shot fired into Lusk, occurred before Bluett even entered the stairwell.

Defendant also argues that Lusk's testimony as to the timing and manner of her shooting is contradicted by Bluett's failure to observe defendant looking out the apartment door as he approached the scene, and by Officer Jones' testimony that one could not see the apartment door from the stairwell. It is asserted that this testimony is inconsistent with

Lusk's testimony that she was shot immediately after defendant looked out the apartment door and said, "We're not going to be able to make it out of here." We disagree.

Defendant's statement does not establish that he saw a police officer when he looked out the door. It is equally as likely that he saw residents of the apartment building who were alerted by the initial gunshots, or that he simply heard someone say that the police had arrived. These possibilities find support in the record. It was, in fact, a resident of the building who later assisted Bluett in handcuffing defendant in the hallway. The failure of Bluett to observe defendant looking out the door would be consistent with Bluett's testimony that he did not hear the lone gunshot, which would have been fired before he came within the range of hearing it.

Finally, defendant maintains that the presence of firearms evidence in the living room and hallway near the bedroom negates Lusk's testimony that Daniels was shot in the bathroom, and supports the theory that she received a bullet meant for him. While it is true that such evidence was found in locations outside the bathroom, and that Lusk and Daniels were found by the police lying on the living room floor bleeding, this evidence is consistent with the State's theory that the assailants placed the bodies and evidence together in an effort to make it appear that the victims had shot each other. For the jury to have believed that Daniels was shot while in the living room, they would have been required to disbelieve Lusk's testimony that it took place in the bathroom and also to ignore the evidence of the blood which was spattered throughout the bathroom, the expended .25 cartridge in the sink, and the broken window panes in the bathroom.

In conclusion, we reiterate that defendant's intent to kill is clear from his actions at Lusk's apartment. Lusk, the only witness to the murder of Daniels, testified that defendant ordered her to "shut up and get on the floor," and not to move. He held his gun on the victims while Everette struck Daniels, and later shot her in the legs when she attempted to get up. According to Lusk, the paralyzing shot to her neck was not received during a "shoot-out" but at point blank range after Everette stated: "Shoot that bitch in the head." The evidence convincingly demonstrates that the jury could only have found that defendant intended to kill Lusk and is guilty of her attempted murder.

We, therefore, reject defendant's contention that reversible error occurred when the jury received the defective attempt murder instruction.

Accordingly, the petition for rehearing is denied.

SULLIVAN, P. J., and MEJDA, J., concur.