THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ELMORE MYLES, Defendant-Appellant.

First District (5th Division) No. 83—0885.

Opinion filed March 29, 1985.—Rehearing denied April 24, 1985.

Steven Clark and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jane E. Liechty, and John C. Legutki, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was found guilty of the offense of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1), and sentenced to a term of 30 years' imprisonment. Defendant appeals from that verdict and sentence. We affirm.

The issues presented for review are (1) that error occurred with the sending of a photograph which was in evidence to the jury; (2) that the extent and nature of the State's "investigatory procedure" testimony and its use by the State in closing arguments was improper; (3) that other closing arguments by the State were improper; and (4) that the court erred at sentencing in its finding of premeditation.

The evidence and testimony disclosed that the victim, Al Young, resided with his girlfriend, Esther Johnson, in apartment No. 705 of a nine-story Chicago housing project located at 2430 South State Street.

Kenneth Lester testified that on March 5, 1982, at approximately 12:50 a.m., he arrived at the victim's apartment requesting the use of the victim's telephone. Lester, who resided at 101st and Carpenter Street in Chicago, originally came to the 2430 building to visit his girlfriend who lived down the hall from the victim. When he arrived at the building, he attempted to see his girlfriend; he had previously been living in the apartment with her. She would not open the apartment door to him. They argued through the closed door for awhile before the woman called the police, who escorted Lester down to the first floor of the building. Once the police left, Lester returned to the seventh floor to call his girlfriend from the victim's apartment; he did not reach her, as she would not answer his calls.

Shortly thereafter, Lester and the victim left the victim's apartment and proceeded to the ninth floor by way of the building's "back" stairwell; the door to the ninth floor was open. Upon their arrival on the ninth floor, the two men separated. The victim turned to his right and walked down the hallway; Lester turned left and walked around a corner to a gallery of windows.

From the gallery area where he waited, Lester was unable to see the victim; he was, however, able to hear the victim's footsteps as he proceeded down the hallway. Lester then heard five or six gunshots, all sounding as if they had come from the same gun. After hesitating for five seconds, Lester turned back towards the stairwell, which was located 10 to 15 feet from the gallery area. As he approached the hallway that the victim had walked down, Lester turned to his left and saw the victim lying on the floor; his feet faced Lester. He saw two men "near" the victim's body. He identified one of the men as the defendant, Elmore Myles. He testified that the defendant was standing in front of the second man so that he was unable to see him. Defendant, however, was only 10 feet away and in plain view. Lester was able to view the defendant for three seconds before he began to back away from the scene. He also observed these men for 10 seconds as he backed towards the stairwell; the defendant appeared shocked to see Lester.

During this time, he observed defendant holding a gun up next to the side of his head. He did not remember seeing smoke coming from the gun, nor did he see anyone else in the hallway. Lester then ran down the same stairwell that he and the victim had previously used to get to the ninth floor.

Later that morning, Lester went to police headquarters, where he was shown a group of five or six color photographs. He identified the defendant from one of the photographs as the man that he saw in the hallway holding a gun. Nine days later, he attended a lineup where he positively identified the defendant from among the group of men that the police had gathered.

During direct examination, Lester again identified this photograph as the same one that he identified on the day of the victim's death. He also identified a photograph of the lineup that he attended. While on the stand, he pointed out the defendant as the man that he saw in the ninth floor hallway on March 5, 1982.

On cross-examination, Lester testified that there was no doubt in his mind that defendant was the man that he saw. When asked by defense counsel whether, during the course of the investigation, he ever voiced his doubt that it was defendant that he saw, Lester replied that he told one of the detectives that he was unsure that it was defendant. On redirect, Lester testified that shortly after he voiced his doubt about defendant to the first detective, he spoke to another detective and told him that he was sure that he saw defendant; he stated that he was "scared" during the initial questioning.

Ollie Mae Clark testified that she lived in apartment No. 907 of

the 2430 building. In the early morning hours of March 5, 1982, she was watching TV in the living room of her apartment; the oldest of her three children who were living with her was still out, and she believed that he had gone to the building's seventh floor. On direct examination, she indicated that she heard noises outside her door, but continued to watch TV. Hearing a gunshot, she immediately started towards the door of the apartment. By the time that she reached the door, she heard two more shots. Looking out the peephole in the door, unable to see anything, she pulled the chained door open the width of the chain. Still unable to see anything, she unchained the door and stuck her head out the door. She observed a man lying on the floor of the hallway. She also heard footsteps going down the stairwell near her apartment. As she walked closer to the victim, she saw a man bending over him; her son had still not returned home. She did not immediately recognize the victim, but recognized the man bending over the victim as a man whom she knew as "Maizey." She later learned that his real name was Alfred Myles, a brother of the defendant. She knew "Maizey's" brother (defendant) and did not see him in the hallway that morning.

On cross-examination, she testified that the door of her apartment was four feet from her TV; that four to five seconds elapsed from the time that she heard the shots and crossed the room; that the man she saw bending over the victim was holding a gun; that she ran to the apartment door immediately after the shots were fired. She stated that she remembered telling her story to Detective Murphy of the Chicago police department, but that she never told him that she saw the victim falling to the floor. On redirect, she testified that in order for her to get from her living room to the door of her apartment, she had to go down a hallway, and that it wasn't until she peeked out the peephole and cracked the door that she finally opened the door to look into the hallway.

Barbara Curtis, a sister of the defendant, testified that at 1 a.m. on March 5, 1982, she was in apartment No. 903 of the 2430 building playing cards with a group of people which included her two brothers, Elmore and Alfred. During the game, she noticed a gun on the top of the apartment's refrigerator; she had seen it before "from Elmore" (defendant). She stated that the victim came to the door of the apartment at 1:20 a.m.; her brothers and Curtis Smith went into the hall with the victim. Ms. Curtis and two other women followed them to the door, but stayed inside the apartment; they cracked the door trying to hear what was happening in the hallway. She testified that they heard gunshots in the hall and immediately looked out the door into

the hallway. She saw her brothers and Smith all down in the position where the victim was later found (outside apartment No. 901). She became sick and returned to the apartment. She noticed the gun was no longer on top of the refrigerator; she did not see the actual shooting.

Detective Leo Wilcosz testified that he was working the 12:30 a.m. to 9 a.m. shift on March 5, 1982, with his partner, Detective Carey, when he received an assignment to investigate a shooting death on the ninth floor of the CHA building at 2430 South State Street. Arriving at the scene at approximately 2 a.m., he noticed a large group had gathered in the hallway; one-half of these people were police personnel. As he stepped off the elevator, he observed the victim lying face-up on the floor; the lighting conditions were "good artificial lights."

Following a discussion with the original reporting officer on the scene, Detectives Wilcosz and Carey began a survey of the residents of the ninth-floor apartments. Wilcosz testified that he went to apartment No. 903 and found three female adults and several children; he then went to Ollie Clark's apartment. Returning to apartment No. 903, he received five color snapshots from Barbara Curtis. He also received an additional snapshot from another of defendant's sisters. These snapshots were later shown to Kenneth Lester at the police station.

In the course of his direct testimony, Wilcosz identified one photograph from the group as a picture of defendant. He later testified that he took the same group of photographs to Ollie Clark's apartment, where she identified from a different photograph defendant's brother, Alfred Myles, as the man she saw bending over the victim.

After transporting Ms. Curtis and Vanessa Mobley (also present in apartment No. 903 the morning of March 5) to Area I headquarters, Wilcosz met with Kenneth Lester between 3 a.m. and 5 a.m. His partner was also present. He showed Lester the same packet of photographs that Barbara Curtis had given him. During direct examination, Wilcosz viewed the snapshot and identified it as the same photograph from which Lester had made his initial identification. Wilcosz and Carey turned the case over to Detectives David O'Callaghan and Silva Stenzi between 8 a.m. and 8:30 a.m. that same morning.

Detective O'Callaghan testified that he received the packet of photographs from Detectives Wilcosz and Carey when he came on shift at 8 a.m. on March 5, 1982. After interviewing Ollie Clark at the police station, he spoke to Kenneth Lester at 9:30 a.m. Lester identified the defendant from one of the photographs in the packet as the man that he saw bending over the victim that morning. O'Callaghan testified

that Lester told him that he'd been nervous during a prior identification, and had related to the detectives that he met with earlier that morning that he was not sure (that it was defendant); he told O'Callaghan that he was now positive. The detective also spoke to Barbara Curtis and Vanessa Mobley. Warrants on defendant and his brother Alfred were issued at 2 p.m. O'Callaghan's shift ended before he could apprehend defendant.

Detective John Murphy took over the case at 4:30 p.m. on March 5, 1982; he received the arrest warrants on defendant and his brother from Detective O'Callaghan. He went to apartment No. 903 where defendant's girlfriend, Doris Paige, resided; she was not home. Murphy also went to a number of other places looking for defendant, but was unable to locate him. Alfred Myles, defendant's brother, was apprehended on March 7, 1982.

Murphy was not able to arrest defendant until March 16, 1982, when he found him in apartment No. 903. Later that day, a lineup was conducted; Kenneth Lester identified defendant in this lineup as the man whom he saw standing over the victim with a gun in his hand. On direct examination, Murphy identified a photograph as a picture of this same lineup. This was the same photograph that Kenneth Lester had identified. On cross-examination, defense counsel refreshed his recollection of his testimony before the grand jury, where he testified that Ollie Clark told him that she saw the victim fall to the floor.

The parties stipulated that the victim arrived at Mercy Hospital at 2:25 a.m. and was pronounced dead at 3:10 a.m.; that an autopsy was performed on the victim on March 6, 1982; that the autopsy showed that the victim's bile was negative of opiates, his urine was negative of barbituates, he had a blood alcohol content of 68 milligrams, and the cause of death was multiple gunshots to the head.

At the close of its case in chief, the State moved that all of its exhibits be admitted into evidence; there was no objection by defendant. However, argument ensued as to what evidence would go to the jury. Defendant objected to the photographs (People's exhibits Nos. 4 A through F), which were given to police by defendant's sisters, being sent to the jury. The court, in a reversal of its prior decision that the photographs would not go to the jury, allowed all photographs, including exhibit No. 4C, to go to the jury.

The defendant did not present a defense.

Following closing arguments and instructions, the jury found defendant guilty of the murder of Al Young. After arguments in aggravation and mitigation, the court sentenced defendant to 30 years.

Defendant appeals from judgment on this verdict and sentence.

OPINION

■ Defendant initially contends that error occurred when Detective Wilcosz volunteered that a photograph showed defendant with a "nickel bag" of marijuana, and that sending the photograph to the jury room reminded the jury of this testimony.

During Detective Wilcosz' testimony regarding five photographs that he had been given by defendant's sister, Barbara Curtis, the following colloquy occurred:

> "State's Attorney: Of the five [photos] that you got from Barbara Curtis, the sister in [apartment] 903, are any of those of defendant Elmore Myles?
>
> Witness Wilcosz: Yes, sir, the photograph with the wine bottles, and he is holding what appears to be a nickel bag of marijuana. ***
>
> Defense counsel: Objection, Your Honor.
>
> The court: Sustained. The jury will disregard the last comment."

The defense counsel requested a sidebar, and asked the court to declare a mistrial. The court denied this request, and testimony resumed with the detective identifying the photograph in issue as being a picture of defendant. Requesting another sidebar, the defense counsel inquired as to the State's contemplated use for the photograph. The court determined at this time that it would not allow the photograph to be shown to the jury, but that it would allow the State to discuss it. Following the sidebar, the court again admonished the jury with the following language:

> "The court: I have struck a portion of the officer's testimony, and I am now asking you to disregard that statement and not to consider it in any way in connection with your deliberations in this case."

This photograph, along with several others, was admitted into evidence. Later, the State moved to send the photograph in issue back to the jury room, and defense counsel renewed his objections to this action. The court, in reversal of its previous decision that the photograph should not go to the jury, found that any problems with the picture would have dissipated with the passage of time, and allowed the photograph to go to the jury.

Defendant contends that the court committed reversible error by sending this photograph to the jury. He posits that the court's admonitions to the jury could not have cured the prejudice created by the

detective's comment and that the sending of the photograph to the jury would have sharply brought back to mind this prejudicial testimony.

Conversely, the State maintains that the trial court was well within its discretion when it allowed the jury to view the photograph in issue and that no error occurred at trial where the voluntary statement made by the detective was objected to by the defendant and the jury was twice admonished by the court to disregard the statement. The State contends in the alternative that even if the photograph was improperly sent to the jury, the error was harmless when viewed in light of the overwhelming evidence elicited at trial.

We first turn to consider whether the detective's unsolicited comment that defendant was holding "what appears to be a nickel bag of marijuana" was error. While the remark was improper, it was not called for by the question posed to the witness by the assistant State's Attorney. We are of the opinion that in view of that fact, together with the prompt striking of the language in question and the court's admonitions to the jury, no prejudicial error remains from the detective's comment. See *People v. Kirkwood* (1959), 17 Ill. 2d 23, 31, 160 N.E.2d 766, *cert. denied* (1960), 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1623; *People v. Travis* (1981), 94 Ill. App. 3d 983, 991, 419 N.E.2d 433; *People v. Belvedere* (1979), 72 Ill. App. 3d 998, 1014, 390 N.E.2d 1239.

We next consider whether the trial court erred when it allowed People's exhibit No. 4C, a snapshot of defendant, to go to the jury. Although we have stated that the detective's improper comment was cured with no prejudicial error remaining, defendant argues that the sending of this photograph to the jury was reversible error because it would have reminded the jury of the detective's "prejudicial comment," which he argues had no probative value by itself once other identification testimony had come into evidence. We disagree.

■■ ■ The primary conditions for the admissibility of photographs are accuracy and relevancy. (*People v. Donaldson* (1962), 24 Ill. 2d 315, 318, 181 N.E.2d 131.) Where photographs are relevant to establish any fact in issue, they are admissible. (*People v. Henenberg* (1973), 55 Ill. 2d 5, 13, 302 N.E.2d 27.) Relevant photographs have been found admissible in the court's discretion to prove a person's identity. (*People v. Gerecke* (1977), 45 Ill. App. 3d 510, 514, 359 N.E.2d 1178.) The admission of a photograph into evidence does not necessarily become cumulative merely because there is also oral testimony on the same subject. *People v. Henenberg* (1973), 55 Ill. 2d 5, 14, 302 N.E.2d 27.

■ In the case at bar, we are presented with a photograph which was introduced by the State to prove defendant's identity. Detective Wilcosz testified that he received the photograph from defendant's sister, and that Kenneth Lester identified the defendant from the photograph as the man he saw standing next to the victim. Kenneth Lester testified that this photograph was the one which he used on March 5, 1982, to make an identification of defendant. Detective O'Callaghan identified the photograph as that which Lester used to positively identify defendant. We find no abuse of discretion on the part of the trial court in sending this photograph back to the jury. The photograph was relevant to show the identity of the defendant.

Even assuming *arguendo* that the photograph reminded the jury of the detective's stricken testimony, we fail to see how this situation would operate to change our determination above.

■ It is the general rule that evidence of offenses, acts and wrongs other than those for which defendant is being tried is inadmissible. (*People v. Baptist* (1979), 76 Ill. 2d 19, 27, 389 N.E.2d 1200.) The underlying rationale is that such evidence has too much appreciable probative value, and is therefore objectionable. (*People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288.) "The law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime." (*People v. Lehman* (1955), 5 Ill. 2d 337, 342, 125 N.E.2d 506.) However, there are certain exceptions to this rule. If the evidence of other offenses or bad acts is relevant for any purpose other than to show propensity to commit a crime, the evidence is admissible. (*People v. Baptist* (1979), 76 Ill. 2d 19, 27, 389 N.E.2d 1200.) Examples of these exceptions would be evidence which goes to show motive, intent, identity, absence of mistake or *modus operandi*. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.) However, the court may exclude even this type of evidence if its incremental probative value is substantially outweighed by the risk that its admission will create a danger of undue prejudice to the accused. *People v. Friedman* (1980), 79 Ill. 2d 341, 355, 403 N.E.2d 229.

■ If the jury, while viewing this photograph, inferred prior bad acts (use/possession of marijuana) by defendant, we believe that the photograph was still relevant to defendant's identification by an occurrence witness, and was therefore alternatively admissible as an exception to the general rule excluding evidence of other crimes.

In the present case, we find a significant degree of probative value in defendant's photograph. It was probative of the original identification of the defendant by Kenneth Lester, as well as to the cor-

roboration of the detectives' testimony regarding statements made to them by Kenneth Lester and Barbara Curtis. We believe the risk of prejudice to the defendant concerning any possible inference that the jury might make from the photograph is substantially outweighed by its probative value.

We note that the major bulwark against prejudicing the jury is the sound discretion of the trial judge, and "the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant." (*People v. Jenko* (1951), 410 Ill. 478, 482, 102 N.E.2d 783.) Therefore, the sending of this photograph to the jury cannot be deemed an abuse of discretion.

Assuming *arguendo* that we were to find that the trial court erred in sending this photograph to the jury, we would find this error harmless.

"Harmless error is a technical violation of a rule of evidence, properly brought to the attention of the trial court, not considered a sufficient basis for reversal because the admission or exclusion did not affect a substantial right of a party." (E. Cleary and M. Graham, Handbook on Illinois Evidence sec. 103.10, at 27 (4th ed. 1984).) The determination of harmless error must be analyzed on the particular facts of each case, considering the trial record as a whole. (*United States v. Hasting* (1983), 461 U.S. 499, 508, 76 L. Ed. 2d 96, 105-06, 103 S. Ct. 1974, 1980.) Error is harmless where a reviewing court can safely conclude that a trial without the error would produce no different result. *People v. Warmack* (1980), 83 Ill. 2d 112, 128-29, 413 N.E.2d 1254.

In *People v. Wilkerson* (1981), 87 Ill. 2d 151, 157, 429 N.E.2d 526, our supreme court summarized three approaches for measuring harmless error: (1) focusing on the error to determine whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; (3) determining whether the evidence is cumulative or merely duplicates properly admitted evidence.

Applying the first approach to the case at bar, we believe that this error would not have contributed to the defendant's conviction, and find *People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35, illustrative of a situation where the supreme court applied the doctrine of harmless error where the error itself was unlikely to have contaminated the jury.

In *Butler*, the defense, prior to the appearance of the arresting officers at trial, moved that the officers be precluded from testifying that defendant had been originally arrested pursuant to an unrelated

murder investigation, urging that such information would prejudice the jury. Following the State's assurance to the court that the officers would not testify as to the nature of the unrelated offense, the trial court agreed that the State could show that defendant had been arrested for a prior offense so as to explain why he was already in custody before any victim in the concerned incident had identified him.

Thereafter, references were made by a testifying officer that he was a "homicide investigator" who worked in "Area 4, Homicide"; that as a result of his arrest on the prior offense, defendant was taken to "Area 4, Homicide Unit" for questioning and then taken to central detention; and that defendant was arrested on the present charge of murder when he was returned to "Area 4, Homicide." Further, reference to "Area 4" and defendant's original processing was mentioned by the prosecution in closing arguments.

The *Butler* court found that it was possible that some jurors may have concluded that defendant had been originally arrested for murder based on the inferences to "Homicide" and "Homicide Unit," but determined that it was unlikely and by no means certain that they did. Further, the court refused to be persuaded that these "vague and indirect references that defendant had been initially arrested in connection with a different murder could have affected the [present] guilty verdict." 58 Ill. 2d 45, 49.

We find the inferences in *Butler* much more egregious than those possibly made by the jury in the case at bar. To hold that the sending of the photograph in issue to the jury was reversible error would require us to presume that the jury remembered the detective's stricken testimony, recognized whatever defendant was holding in his hand in the picture as a "nickel bag," and then adjudicated his guilt as to the present murder charge based on his possible use/possession of marijuana. We do not believe that justice requires this course be taken.

■ The concern of a reviewing court is prejudicial error, and the court need not determine that a trial was devoid of error before affirming a conviction. (See *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 697, 402 N.E.2d 915, *cert. denied* (1981), 450 U.S. 915, 67 L. Ed. 2d 340, 101 S. Ct. 1357.) It is our judgment that any prejudice to defendant which occurred as a result of the jury seeing the photograph in question was minimal, and when considered along with the strong evidence of guilt which this record presents, we have no hesitation in stating our belief that the error was harmless beyond a reasonable doubt insofar as the jury's determination of defendant's guilt was concerned.

Finally, we find defendant's reliance on *People v. Lindgren* (1980),

79 Ill. 2d 129, 402 N.E.2d 238, and *People v. Stadtman* (1974), 59 Ill. 2d 229, 319 N.E.2d 813, to be misplaced. In both cases, the "other" crimes evidence admitted was so highly prejudicial as to warrant reversal. We have determined this not to be the case here.

We next turn to address defendant's argument that the extent and nature of the State's "investigatory procedure" testimony and its use by the State in closing arguments was improper and constituted reversible error.

Defendant initially contends that the testimony of three Chicago police detectives who described the extensive investigatory procedures necessary to defendant's apprehension gave the impression of a stronger, weightier and more extensive State's case than actually existed. Defendant further posits that this testimony included details "prejudicial" to him.

We initially note that no objections to this line of questioning were made at any time by the defense counsel, nor did defendant raise this point as error in his motion for a new trial.

It is fundamental to our adversarial system that counsel must object to errors at trial. (*People v. Roberts* (1979), 75 Ill. 2d 1, 10, 387 N.E.2d 331.) The rationale underlying this procedural requirement is based on the need for timely resolution of evidentiary questions at trial. (*People v. Linus* (1971), 48 Ill. 2d 349, 355, 270 N.E.2d 12.) It is clear that the failure by the defendant to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a reason for reversal on review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) This rule applies to constitutional questions as well as to other issues. *People v. Long* (1968), 39 Ill. 2d 40, 43, 233 N.E.2d 389.

We recognize, however, that the waiver doctrine is not absolute. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233.) Supreme Court Rule 615(a) provides an exception to this rule of waiver where there has been "plain error." The rule reads in part:

> "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 87 Ill. 2d R. 615(a).

However, Rule 615(a) does not mandate that a reviewing court consider all errors involving substantial rights whether or not they had been raised in the trial court. (*People v. Howell* (1975), 60 Ill. 2d 117, 120, 324 N.E.2d 403.) Rather, the rule is a means of ameliorating the harshness of the strict application of the general waiver rule. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) "A significant purpose of the plain error exception to the waiver doctrine is

to correct any serious injustices which have been done to the defendant. It therefore becomes relevant to examine the strength or weakness of the evidence against him; if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved. Thus, this court has held that where the evidence is closely balanced, a court of review may consider errors that have not been properly preserved for review." *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233.

We do not consider that the defendant was deprived of a fair and impartial trial nor was he prejudiced by the testimony of the three detectives as to their investigatory procedures. We also do not consider that the evidence is closely balanced. We find no reasons for departing from the general rule that issues not properly preserved for review are waived.

In the case at bar, Kenneth Lester testified that upon hearing shots fired, he turned a corner and saw defendant standing over the victim with a gun in his hand. There was another man with defendant, but Lester could not see him. Ollie Clark testified that upon opening her apartment door to the hallway, she heard footsteps going down a nearby stairwell and then observed a man she knew as "Maizey" standing over the victim's body. She later discovered that "Maizey" was defendant's brother. Barbara Curtis, defendant's sister, testified that she was with the defendant just before the murder; that defendant, his brother "Maizey" and another man joined the victim in the ninth-floor hallway; that she had seen a gun "from Elmore [defendant]" on top of the apartment's refrigerator before hearing the shots, but that the gun was no longer on top of the refrigerator after the shooting; and that she had seen defendant next to the victim after she heard the shots and went into the hallway. The defendant presented no evidence. In view of these facts, there is no reason to exercise our authority to consider whether the State's investigatory procedure testimony was plain error under Rule 615(a).

██ We now consider defendant's argument that the State's closing argument regarding the investigatory procedures of Detectives Wilcosz, O'Callaghan and Murphy resulted in a representation to the jury that defendant and his brother were the only suspects in this case. This representation, defendant argues, was prejudicial enough to warrant a new trial.

Our analysis of this contention focuses on the defendant's post-trial motion, which merely states that the trial court erred in allowing the State to make "prejudicial inflammatory and erroneous statements in

closing argument designed to arouse the prejudices and passions of the jury." We note that the motion does not set forth the specific remarks asserted to be prejudicial.

Similar situations were addressed in *People v. Camp* (1984), 128 Ill. App. 3d 223, 470 N.E.2d 540, and *People v. Turk* (1981), 101 Ill. App. 3d 522, 428 N.E.2d 510. In *People v. Camp*, the appellate court declined to endorse a lax post-trial practice that would defeat the underlying purpose of the post-trial motion, namely, to allow the court the opportunity to review and correct alleged errors that occurred during trial. The court found defendant's statement that the trial court "erred in allowing the State to make a prejudicial and improper closing argument" to be not sufficiently specific to preserve the issue for review. (128 Ill. App. 3d 223, 232.) In *People v. Turk*, the defendant's post-trial motion was not deemed sufficiently specific where it merely alleged that the prosecutor's closing arguments were " 'inflammatory, prejudicial and invaded the defendant's Sixth Amendment right to counsel and exhorted the jury to convict the defendant based on matters which [are] dehor [*sic*] the record in violation of defendant's rights under the Sixth and Fourteenth Amendments of the United States Constitution.' " 101 Ill. App. 3d 522, 533.

The motion in the instant case is as general as the preceding two examples, and we therefore will not hesitate to find that defendant's post-trial motion was not sufficiently specific to preserve this issue for review. We conclude that the issue has been waived. In conjunction with our above determination as to the strength of the State's case, we will therefore not recognize the alleged errors under the plain-error doctrine.

█ Further, we stand on this same conclusion in our consideration of defendant's contentions that other various comments made by the State in closing arguments were improper and therefore warranted a new trial for defendant. We deem these issues also waived, and will not recognize these contentions under the plain-error doctrine for the above reasons. We have carefully reviewed the entire record and find that defendant received a fair and impartial trial.

█ █ Finally, defendant contends that the trial court abused its discretion when it found that the defendant was the "shooter" in a premeditated murder, and that it was improper for the trial court to use the "crimes of passion" standard as the minimum standard for a murder sentence. Conversely, the State maintains that the trial court did not abuse its discretion in sentencing because it merely commented on the finding of the jury, and did not rely on improper standards in making its decision to sentence defendant to 30 years for the murder

of Al Young.

Preliminarily, it should be noted that defendant was charged and convicted pursuant to section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1), the minimum sentence for which is 20 years and the maximum 40 years. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(a).) The standard of review of allegedly excessive sentences is whether a trial court abused its discretion. *People v. Kuesis* (1980), 83 Ill. 2d 402, 408, 415 N.E.2d 323.

In *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882, the supreme court stated:

> "A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case. [Citation.] Such a judgment depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citation.] The trial judge, in the course of the trial and the sentencing hearing, has an opportunity to consider these factors 'which is superior to that afforded by the cold record in this court.' [Citation.] We continue to find that the trial court is normally the proper forum in which a suitable sentence is to be determined and the trial judge's decisions in regard to sentencing are entitled to great deference and weight." 68 Ill. 2d 149, 154.

We will now consider whether this record discloses that the trial court abused its discretion by imposing the sentence in the instant case. Here, the record reveals that the trial judge weighed the evidence and found that it indicated not only premeditation, but also that the defendant's role was an active one; he stated that he heard no evidence in the record concerning mitigation of the facts surrounding the victim's death. It is clear from our careful review of the record that the trial court imposed this sentence after giving due consideration to the evidence presented and the presentencing report. We believe that the trial court, after careful consideration of the proper factors and full compliance with statutory requirements, did not abuse its discretion when it sentenced defendant to 30 years of imprisonment for the murder of Al Young.

For the foregoing reasons, we affirm the judgment and sentence of the circuit court of Cook County.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.